# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SAHAMITR PRESSURE CONTAINER PLC.,

Plaintiff-Appellant,

and

WORLDWIDE DISTRIBUTION, LLLP,

Plaintiff

v.

UNITED STATES,

Defendant-Appellee,

and

WORTHINGTON ENTERPRISES, INC.,

Defendant-Appellee.

Appeal from the United States Court of International Trade
in Case No. 1:22-CV-00107
Judge M. Miller Baker

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## SAHAMITR PRESSURE CONTAINER PLC.

Jay C. Campbell
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant Sahamitr
Pressure Container Plc.

November 25, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

|  |  |
|---|---|
| **Case Number** | 2024-2043 |
| **Short Case Caption** | Sahamitr Pressure Container Plc. v. US |
| **Filing Party/Entity** | Sahamitr Pressure Container Plc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 07/17/2024

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Sahamitr Pressure Container Plc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .......................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE..............................................................4

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT .................................................................................13

    I.    STANDARD OF REVIEW...................................................13

    II.    THE DEPARTMENT'S REJECTION OF SMPC'S REPORTED
        ALLOCATION METHODOLOGIES AS "DISTORTIVE" WAS
        UNSUPPORTED BY SUBSTANTIAL EVIDENCE ............................14

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States,*
  112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ......................................................14

*Allegheny Ludlum Corp. v. United States,*
  346 F.3d 1368 (Fed. Cir. 2003) ...........................................................................18

*Am. Silicon Techs. v. United States,*
  334 F.3d 1033 (Fed Cir. 2003) ............................................................................13

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,*
  412 U.S. 800 (1973)..............................................................................................18

*Atlantic Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) ...........................................................................14

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962)..............................................................................................13

*Chr. Bjelland Seafoods A/S v. United States,*
  19 C.I.T. 35 (1995) .........................................................................................14, 17

*Huaiyin Foreign Trade Corp. v. United States,*
  322 F.3d 1369 (Fed. Cir. 2003) ...........................................................................13

*Jinan Yipin Corp. v. United States,*
  526 F. Supp. 2d 1347 (Ct. Int'l Trade 2007) ......................................................14

*JTEKT Corp. v. United States,*
  642 F.3d 1378 (Fed. Cir. 2011) ...........................................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)................................................................................................16

*Sahamitr Pressure Container Plc. v. United States,*
  2024 Ct. Intl Trade LEXIS 53, Slip Op. 2024-54 (May 2, 2024) ........................4

*SEC v. Chenery,*
  318 U.S. 80 (1943)................................................................................................17

*Timken U.S. Corp. v. United States*,
    421 F.3d 1350 (Fed. Cir. 2005) ...........................................................16

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)...........................................................................13

*USX Corp. v. United States*,
    655 F. Supp. 487 (Ct. Int'l Trade 1987) ......................................14, 17

*Viraj Group v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007) .........................................................13

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) .......................................................14

## STATUTES AND REGULATIONS

19 U.S.C. § 1675(a)(1).............................................................................5

19 U.S.C. § 1677b(a) ...............................................................................4

19 U.S.C. § 1677b(a)(6)(C)(iii) ...............................................................4

19 U.S.C. § 1677m(i)(1) ..........................................................................6

19 C.F.R. § 351.401(g) ..........................................................................10

19 C.F.R. § 351.401(g)(1).........................................................................5

19 C.F.R. § 351.401(g)(1)-(3)..................................................................11

19 C.F.R. § 351.401(g)(2).......................................................................15

19 C.F.R. § 351.401(g)(2)-(3)....................................................................5

19 C.F.R. § 351.410(b)-(c).........................................................................4

19 C.F.R. § 351.410(c)..............................................................................6

# ADMINISTRATIVE DETERMINATIONS

*Steel Propane Cylinders from the People's Republic of China and Thailand: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Orders,*
84 Fed. Reg. 41703 (Aug. 15, 2019) ....................................................................5

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiff-Appellant, Sahamitr Pressure Container Plc. ("SMPC") makes the following statement:

1.     No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.     No other action pending before the Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

# JURISDICTIONAL STATEMENT

The action filed by Plaintiff-Appellant, *Sahamitr Pressure Container Plc. v. United States*, Ct. No. 22-00107, which resulted in this appeal, contested the final results of the 2018-2020 administrative review conducted by the U.S. Department of Commerce ("Department") of the antidumping duty ("ADD") order covering steel propane cylinders from Thailand ("*Final Results*"). The CIT had exclusive jurisdiction over SMPC's complaint under 28 U.S.C. § 1581(c).

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On May 2, 2024, the CIT issued the final decision from which this appeal was taken. SMPC filed a timely notice of appeal on July 3, 2024.

## STATEMENT OF THE ISSUES

Was the Department's use of a period-of-review ("POR") wide allocation for SMPC's certification expenses supported by substantial evidence?

## STATEMENT OF THE CASE

SMPC appeals from the final decision of the CIT in *Sahamitr Pressure Container Plc. v. United States*, 2024 Ct. Intl Trade LEXIS 53, Slip Op. 2024-54 (May 2, 2024) ("*SMPC*"). *See* Appx1-11. Pursuant to Federal Circuit Rules 28(a)(11) and 28(c)(1)(A), the CIT's decision is attached hereto in the Addendum.[1]

## The Antidumping Statute and Direct Selling Expenses

Under the antidumping statute, the Department determines whether the merchandise subject to an ADD investigation or order (the "subject merchandise") "is being, or is likely to be, sold at less than fair value" by comparing normal value (*i.e.*, the price of the merchandise in its home market) and the export price (*i.e.*, the price of the merchandise in the United States). *See* 19 U.S.C. § 1677b(a). In doing so, the Department is required to adjust normal value by the amount of "any difference" between the export price and normal value due to "differences in the circumstances of sale." 19 U.S.C. § 1677b(a)(6)(C)(iii). The Department makes such "circumstances of sale adjustments" for "direct selling expenses," which include, but are not limited to, "commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(b)-(c).

---

[1] Additionally, pursuant to Federal Rule of Appellate Procedure 28(f), because this Court's "determination of the issues presented requires the study of statutes, rules, regulations, etc.," the Addendum also includes relevant statutes and regulations.

Per its regulations, the Department prefers transaction-specific reporting of direct selling expenses, but uses allocated expenses when such expenses cannot be reported on a transaction-specific basis. *See* 19 C.F.R. § 351.401(g)(1). "Any party seeking to report an expense . . . on an allocated basis" must demonstrate that the "allocation is calculated on as specific a basis as is feasible" in light of the records maintained in the ordinary course of business. 19 C.F.R. § 351.401(g)(2)-(3).

**The Department's First Administrative Review**

Following an investigation, the Department issued the ADD order on steel propane cylinders from Thailand on August 15, 2019. *See Steel Propane Cylinders from the People's Republic of China and Thailand: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Orders*, 84 Fed. Reg. 41703 (Aug. 15, 2019). Under the antidumping statute, and subject to a request by an interested party, the Department will conduct an administrative review of an ADD order every 12 months. *See generally* 19 U.S.C. § 1675(a)(1). Pursuant to requests filed by SMPC and Petitioner Worthington Industries ("Petitioner"), the Department initiated the first administrative review of the ADD order on steel propane cylinders from Thailand on October 6, 2020. Appx4975, Appx4979. On November 3, 2020, the Department issued the initial questionnaire ("Initial Questionnaire") to SMPC, the sole respondent subject to the review. Appx40.

In relevant part to this appeal, SMPC reported in its home-market and U.S. sales databases whether each steel propane cylinder was certified, and the type of certification issued. Appx877, Appx918. Consistent with the definition of "direct selling expenses" in the Department's regulation, SMPC also reported certification expenses (*e.g.*, testing and inspection services performed by third parties) as direct selling expenses in Field CERTFEEH of its home-market sales database, and Field CERTFEEU of its U.S. sales database. Appx943, *see also* Appx1343-1376; *see* 19 C.F.R. § 351.410(c).

Specifically, SMPC attributed certification fees to individual sales by deriving a ratio that it applied to the gross-unit price of each sale. Appx943. In its response to the Initial Questionnaire, SMPC provided a worksheet demonstrating how it derived the ratio (certification expenses divided by revenues) and accounting system screenshots to support the expenses reported. Appx1343-1376. The Department had verified and accepted this methodology in the original investigation. *See* Appx2266; 19 U.S.C. § 1677m(i)(1) (requiring the Department to "verify all information relied upon in making . . . a final determination in an investigation").

In comments to the Department, Petitioner argued that SMPC's methodology was insufficiently specific and urged the Department to issue a supplemental questionnaire requesting transaction-specific certification expenses. Appx1966-1969. The Department subsequently issued a Supplemental Sections B-C

Questionnaire directing SMPC to explain (1) how it recorded certification expenses in the ordinary course of business; (2) why SMPC could not record them on a more specific basis; and (3) why its "allocation methodology does not cause inaccuracies or distortions." Appx2049.

Referring to the documentation provided in its Initial Questionnaire response, SMPC responded by explaining that, because it paid certification fees to outside vendors on a lump-sum basis *after* production and sale of the merchandise, it could not link specific certification expenses to individual sales invoices. Appx2266. SMPC further explained that the expense allocation it had used was "the most accurate basis" on which it could report certification expenses "using the books and records the company maintains in the normal course of business. . . ." *Id.* SMPC further highlighted the Department's acceptance of this methodology in the original investigation. *Id.* Pursuant to the Department's requests, SMPC also provided a sample purchase order, sample invoices, and additional accounting-system screenshots to demonstrate how SMPC recorded its accounts payable, expenses, and payments relevant to its incurrence of certification expenses. Appx2446-2454.

Persisting, Petitioner next asked the Department to instruct SMPC to report market-specific and monthly-specific certification expenses. Appx3011. The Department then issued SMPC a *second* Supplemental Sections B-C Questionnaire,

this time instructing SMPC to "calculate a monthly, per unit certification expense for the POR for the U.S. and, separately, the home market." *See* Appx4230.

SMPC fully complied with the Department's new instructions and request for information, providing (1) a list of all vendors that provided certification services for SMPC during the POR; (2) details on which vendors provided certification services in which markets; (3) a calculation worksheet in which SMPC derived monthly certification expenses for all home-market and U.S. sales; (4) a narrative explaining how SMPC's calculation worksheet tied to the total POR certification expenses recorded in the company's general ledger; (5) copies of invoices, accounting records, and proof-of-payment documentation to support the largest certification expenses incurred in the home and U.S. markets during the POR; and (6) revised sales databases incorporating the separate monthly, per-unit certification expenses for the U.S. and home markets. *See* Appx4245-4246, Appx4254-4285. Thereafter, the Department did not issue any additional supplemental questionnaires or otherwise instruct SMPC to revise its reporting of certification fees.

Petitioner submitted "pre-preliminary comments" in which it urged the Department to reject the month- and market-specific certification fee reporting that it had specifically requested, and instead use a POR-wide average certification expense ratio in each respective market. *See* Appx4362-4365. SMPC filed rebuttal comments, explaining that there was no justification for the Department to disregard

the company's certification expense data, which was the most specific data feasible using the data recorded in the ordinary course of business.  Appx4569-4571.

The Department issued is preliminary results on September 2, 2021 ("*Preliminary Results*"), assigning SMPC a dumping margin of 14.11% and adopting Petitioner's approach on certification expenses.  Appx4890-4892; *see also* Appx4601-4612, Appx4586.  The Department justified its decision to disregard SMPC's reported market- and monthly-specific certification expenses on the ground that SMPC's allocation method was distorted "due to timing differences between when SMPC produces and sells cylinders and when it records the certification expenses associated with those sales" and that "{t}hese timing differences create monthly fluctuations in SMPC's reported certifications expenses. . . ."  Appx4586.

In its case brief, SMPC argued that the Department's methodology contradicted its practice of using the most detailed expense data available.  *See* Appx4933-4935.  Consequently, SMPC explained, the Department calculated a "less accurate and more distorted dumping margin" than if SMPC's reported expenses were used.  Appx4934.  SMPC further proposed a third, alternative allocation to address the Department's purported concerns about "timing differences."  Noting that gaps in monthly certification expenses were "minor" (out of the 25 months of certification expenses reported, only a handful in each market had zero expenses, *see* Appx4256), SMPC proposed that the Department use "the

POR averages derived for the preliminary results as proxies" for the few months with zero certification expenses, "while retaining . . . the remainder of SMPC's market- and month-specific certification expense data." Appx4936.

In the *Final Results*, the Department corrected two ministerial errors, assigning SMPC a final dumping margin of 13.89%. Appx12. The Department, however, rejected SMPC's arguments regarding the allocation of certification expenses – including SMPC's proposed alternative, which the Department concluded "continues to fail to account for months in which certification expenses are overreported . . . ." Appx4995-4996. Rather, the Department continued to use the POR-wide allocation method for certification expenses, reiterating its explanation from the *Preliminary Results* and asserting that the POR-wide allocation method was consistent with 19 C.F.R. § 351.401(g). *See* Appx4995.

SMPC appealed the *Final Results* to the CIT. On May 2, 2024, the CIT affirmed the *Final Results*. *See* Appx12. This appeal followed.

# SUMMARY OF THE ARGUMENT

The Department's use of a POR-wide allocation methodology for SMPC's certification expenses was unsupported by substantial evidence. SMPC initially reported its certification fees on a POR-wide basis, which the Department had previously verified and accepted. Then, at Petitioner's request, the Department instructed SMPC to revise this approach multiple times. Consistent with the Department's regulation and practice, SMPC then reported its certification fees – which are a direct selling expense – on "as specific a basis as feasible" based on records that it maintains in the ordinary course of business. *See* 19 C.F.R. § 351.401(g)(1)-(3). In short, throughout the administrative review, SMPC simply followed the Department's instructions – only for the Department to end up concluding that SMPC's reporting methodology, which the Department itself requested at Petitioner's insistence, was "distortive."

That the Department deemed SMPC's more specific reporting methodology "distortive" was arbitrary and unreasonable. The Department instructed SMPC to revise its allocation of certification fees from a POR-wide basis to a monthly basis – yet later backtracked and rejected SMPC's monthly-specific reporting due to "timing differences." The Department, however, was aware of such timing differences when it instructed SMPC to use a monthly-specific allocation, and capturing monthly differences in expenses was the point of allocating on a monthly

basis in the first place. Consequently, the Department failed to draw a rational connection between the record evidence and its ultimate decision to reject SMPC's monthly-specific reporting – thereby rendering that rejection unsupported by substantial evidence. The Department also summarily rejected SMPC's alternative methodology, devised to address the Department's concern about the alleged "timing differences." In short, the Department's determination, based on its purported concerns about the "distortive" nature of SMPC's allocation methodology, was unsupported by substantial evidence.

## I. STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). It does so "without affording any deference to the Court of International Trade." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted). This Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951). For a determination to be supported by substantial evidence, there must be a rational connection between the facts on the record and the choice made by the Department. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States,* 322 F.3d 1369, 1374 (Fed. Cir. 2003)

(quoting *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984)). "{I}t is . . . well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States,* 112 F. Supp. 2d 1141**,** 1165 (Ct. Int'l Trade 2000).

A determination based on inadequate reasoning or conjecture cannot survive the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (stating that the Department's determination cannot be made "on the basis of mere conjecture or supposition"); *Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where the Department's determination was based on "mere assumptions, which find no apparent support in record evidence").

## II.   THE DEPARTMENT'S REJECTION OF SMPC'S REPORTED ALLOCATION METHODOLOGIES AS "DISTORTIVE" WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

The Department's use of a POR-wide allocation methodology for SMPC's certification fees was unreasonable and unsupported by substantial evidence.   The Department abandoned an allocation methodology it had previously accepted,

requested more specific information at Petitioner's insistence, and ultimately rejected the more specific methodology when Petitioner proposed yet another approach. In the end, as established below, the Department failed to provide a reasonable justification for rejecting more specific, monthly-based allocations, and failed to articulate why the allocation method chosen was more accurate than either the alternative or original allocation method proposed by SMPC.

The Department found that the monthly and market-specific allocation method for certification expenses that SMPC reported in compliance with the Department's instructions was distortive "due to timing differences between when SMPC produces and sells cylinders and when it records the certification expenses associated with those sales." Appx4995; *see also* Appx4586. Viewed in context, the Department's position is arbitrary and unreasonable. The Department raised concerns that the "timing differences create monthly fluctuations in SMPC's reported certification expenses{,}" but such differences are the point of the regulatory requirement to use an allocation "calculated on as specific a basis as is feasible" in the first place. 19 C.F.R. § 351.401(g)(2). For this reason, the Initial Questionnaire identifies "monthly-specific basis" as an example of an allocation "calculated on as specific a basis as is feasible . . . ." Appx54.

Moreover, SMPC already had explained to the Department in its response to the First Supplemental Sections B-C Questionnaire that it "pays its certification fees

to outside vendors *after* SMPC's production and sale of the merchandise under review," Appx2266 (emphasis added), yet the Department still instructed SMPC (at Petitioner's urging) to report monthly, per-unit certification expenses, *see* Appx4230. *See also* Appx3011 ("Clearly, reporting market- and monthly-specific certification expenses *is* feasible.") (emphasis original). In other words, the Department was aware that monthly certification expenses could vary due to timing differences, which, presumably, was the reason for requesting such a more "specific" allocation basis in the first place. It was only after SMPC reported its certification expenses on a monthly- and market-specific basis (and Petitioner could test the impact on the dumping margin) that Petitioner backtracked and argued for POR-wide allocations. *See* Appx4362.

Given these circumstances, the Department's decision to reject monthly-specific allocations "due to timing differences" rings hollow. Because Commerce failed to draw a "rational connection between the facts found and the choice made{,}" its decision to reject monthly-specific allocations is unsupported by substantial evidence. *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Department also unreasonably rejected SMPC's alternative allocation, which it proposed in its case brief to address the purported concerns about "timing

differences." *See* Appx4936; Appx4256. Specifically, the Department's conclusion that SMPC's "revised method continues to fail to account for months in which certification expenses are overreported" is nonsensical, given that the antidumping questionnaire itself ***presumes*** differences based on timing when it directs respondents to "demonstrate that the allocation is calculated on as specific a basis as is feasible (*e.g.*, on a customer-specific basis, product-specific basis, ***and/or monthly-specific basis***, etc.) . . . ." Appx54 (emphasis added); Appx4996. A determination based on inadequate reasoning cannot survive the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods A/S*, 19 C.I.T. at 37 (citing *USX Corp.*, 655 F. Supp. at 492).

Otherwise, the Department failed to explain why the POR-wide allocation method chosen would be more accurate than use of the alternative method SMPC proposed in its case brief. *See* Appx4996. Instead, Commerce simply stated—in conclusory fashion—that it "determined to continue to rely on the POR-wide allocation method that Commerce relied upon in the *Preliminary Results*." *Id*. "{T}he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery*, 318 U.S. 80, 94 (1943). Nor did the Department explain why it had abandoned the allocation methodology it accepted in the original investigation. *See*, *e.g.*, *Allegheny Ludlum Corp. v. United States,* 346 F.3d 1368,

1373 (Fed. Cir. 2003) ("Commerce is permitted to deviate from {its} past practice, at least where it explains the reason for its departure") (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)).

Overall, the Department rejected all three of SMPC's expense allocation methodologies—(1) a POR-wide method that the Department had previously accepted; (2) a market-by-month method that the Department had specifically instructed SMPC to use, which relied on the most specific and accurate data available; and (3) a proposed hybrid alternative that accounted for the Department's purported concerns while continuing to use the most specific data available—in favor of Petitioner's proposed POR-wide alternative. The Department's decision was unreasonable and cannot be sustained as supported by substantial evidence.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the Department's use of a POR-wide allocation methodology for SMPC's certification expenses in the *Final Results* is unsupported by substantial evidence. SMPC respectfully requests that the Court reverse the CIT's decision and remand to the Department with instructions to issue a revised determination, consistent with the Court's opinion.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant Sahamitr Pressure Container Plc.

November 25, 2024

**ADDENDUM**

*Sahamitr Pressure Container Plc. v. United States*

Slip Op. 24-94
(May 2, 2024)

Appx1 - Appx11

**Slip Op. 24-54**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

————————————

**Court No. 22-00107**

————————————

SAHAMITR PRESSURE CONTAINER PLC.,

*Plaintiff*,

and

WORLDWIDE DISTRIBUTION, LLLP,

*Plaintiff-Intervenor*,

v.

UNITED STATES,

*Defendant*,

and

WORTHINGTON INDUSTRIES,

*Defendant-Intervenor*.

————————————

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the Department of Commerce's final determination.]

Dated: May 2, 2024

*David E. Bond*, *Ron Kendler*, and *Danica Harvey*, White & Case LLP of Washington, DC, on the briefs for Plaintiff.

*Gregory S. Menegaz*, *J. Kevin Horgan*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, on the briefs for Plaintiff-Intervenor.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Alison S. Vicks*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for Defendant. Of counsel on the brief was *Spencer Neff*, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

*Paul C. Rosenthal*; *R. Alan Luberda*; *David C. Smith, Jr.*; and *Matthew G. Pereira*, Kelley Drye & Warren LLP of Washington, DC, on the brief for Defendant-Intervenor.

*Baker*, Judge: In this antidumping case, a foreign producer of propane canisters and a domestic importer challenge the Department of Commerce's recalculation of the former's proffered sales expenses. Finding the agency's methodology supported by substantial evidence, the court sustains it.

I

This matter arises from a Commerce order imposing tariffs on propane canisters. *Steel Propane Cylinders from the People's Republic of China and Thailand: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Orders*, 84 Fed. Reg. 41,703 (Dep't Commerce Aug. 15, 2019). Sahamitr Pressure Container PLC, a Thai producer

and exporter, and Worthington Industries, a domestic manufacturer, each requested an administrative review of that order as it pertains to Thailand. Appx1007; *see also Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 85 Fed. Reg. 47,167, 47,168 (Dep't Commerce Aug. 4, 2020).

The Department obliged and opened a review covering a 19-month period in 2019 and 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 63,081, 63,085 (Dep't Commerce Oct. 6, 2020). It selected Sahamitr as the sole respondent. Appx6013.

As relevant here, Commerce requested that Sahamitr report sales costs using a transaction-specific method and cautioned that providing such information on an "allocated basis (e.g., on an average basis)" was permissible only when those expenses could not "be tied to a specific sale." Appx6027. The Department further warned that allocated reporting would be acceptable only if the company could "demonstrate that the allocation is calculated on as specific a basis as is feasible (e.g., on a customer-specific basis, product-specific basis, and/or monthly-specific basis, etc.) *and* is not unreasonably distortive." *Id*. (emphasis added).

Sahamitr nonetheless reported its certification expenses[1] for U.S. sales on an allocated basis by applying

---

[1] Third parties test and certify the canisters as safe for use. *See* ECF 29-1, at 3.

a "certification-fee ratio" to "customers' gross unit prices to calculate the [reported] per-unit certification expense." Appx2352. The company did not explain why it couldn't disclose such costs using a transaction-specific system or why its method wasn't distortive.

At Worthington's prompting, Commerce directed Sahamitr to explain why it "cannot report the [certification] price adjustment or expense on a more specific basis" and why its "allocation methodology does not cause inaccuracies or distortions." Appx3450.

The company responded that it

> pays its certification fees to outside vendors after [its] production and sale of the merchandise under review, [and] the company cannot attribute individual certification-related expenses to individual sales invoices. The expense-allocation provided is the most accurate basis on which [the company] is able to report [period-of-review] certification expenses using the books and records the company maintains in the normal course of business . . . .

Appx3654. Sahamitr also observed that "the Department accepted this approach in the underlying . . . investigation." *Id*. The company again, however, failed to explain why its allocation method did not cause distortions.

Once again at Worthington's importuning, the Department then requested that Sahamitr "calculate a monthly, per unit, certification expense for the [period of review] for the U.S., and, separately, the home

market." Appx5587. It responded with a calculation that showed wide fluctuations in costs from month to month. Appx5607.

In its preliminary determination, Commerce found that Sahamitr's (second) proffered allocation of its certification costs was distortive

> due to timing differences between when [the company] produces and sells cylinders and when it records the certification expenses associated with those sales. These timing differences create monthly fluctuations in [Sahamitr's] reported certification[] expenses (*e.g.*, two months of expenses allocated to a single month and no fee expenses allocated to other months).

Appx1025. Thus, the Department "calculated a [period-of-review]-wide certification expense ratio . . . rather than relying on [the company's] reported allocation methods." *Id.* Commerce carried over that analysis to its final determination, Appx1323–1324, which (combined with other unchallenged aspects of that decision) resulted in a dumping margin of 13.89%, Appx1630.

## II

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), Sahamitr sued under 19 U.S.C. § 1516a(a)(2)(B)(iii) to challenge Commerce's final determination. ECF 2. Worldwide Distribution LLLP, a domestic importer of Sahamitr's propane canisters, intervened as a plaintiff, ECF 23, and Worthington intervened in support of the government, ECF 18.

Sahamitr (ECF 29) and Worldwide (ECF 30) both moved for judgment on the agency record. *See* USCIT R. 56.2. The government (ECF 31) and Worthington (ECF 33) opposed. Sahamitr (ECF 58) and Worldwide (ECF 60) replied. The court decides the motions on the papers.

In § 1516a(a)(2) actions such as this, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

### III

To determine whether merchandise is being dumped in the U.S., the Tariff Act of 1930, as amended, requires Commerce to figure out the product's "normal value," 19 U.S.C. § 1677b(a)—the home

market price, *see Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334 n.6 (CIT 2020)—and then compare that figure to the "export price or constructed export price" at which the product is sold to the importer, *see id.* at 1334 n.34 (explaining "export price" and "constructed export price"). The Act further directs the Department to adjust the normal value of such goods by the amount of "any difference" between that figure and the export price that "is established to the satisfaction" of the agency "to be wholly or partly due to . . . differences in the circumstances of sale." *Id.* § 1677b(a)(6)(C)(iii).

As described above, Sahamitr sought such an adjustment for costs associated with obtaining the requisite safety certifications for its propane cylinders. The Department requires that expenses be reported on a transaction-specific basis except when doing so "is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1). When a respondent uses an allocated, rather than transaction-specific, method, that party has the burden of showing that the "allocation is calculated on as specific a basis as is feasible" and "explain[ing] why the allocation methodology used does not cause inaccuracies or distortions." *Id.* § 351.401(g)(2).

Sahamitr and Worldwide argue that the former's recalculation of its certification expenses (performed at Commerce's request) was as specific as feasible given the company's records. *See* ECF 29-1, at 10–11; ECF 30-1, at 4–5; *see also* 19 C.F.R. § 351.401(g)(3) (requiring the Department to evaluate the feasibility of

transaction-specific reporting based on the "records maintained by the party in question in the ordinary course of its business"). They also contend that the company's recalculation of its expenses was more specific than the period-of-review-wide recalculation Commerce adopted, and that the agency violated 19 C.F.R. § 351.401(g)(1)–(2) by choosing a less-specific calculation methodology. ECF 29-1, at 10–11; ECF 30-1, at 4–5.[2]

Sahamitr and Worldwide misapprehend the regulation, which requires the "*party* seeking to report an expense . . . on an allocated basis" to do so "on as specific a basis as is feasible." 19 C.F.R. § 351.401(g)(2) (emphasis added). Commerce, on the other hand, "is not required to accept [expense] adjustments on an allocated basis." *NSK Ltd. v. United States*, 510 F.3d 1375, 1382 (Fed. Cir. 2007) (citing 19 C.F.R. § 351.401(g)(1)). Instead, as the "master of antidumping law," the Department has wide discretion to "select[] and develop[] proper methodologies." *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (quoting *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).

Here, the Department exercised that discretion by selecting an allocation method that provided Sahamitr

---

[2] In its reply brief, Sahamitr argues for the first time that it was unreasonable for the Department to reject the company's initial expense calculation for this review as insufficiently specific when the agency previously accepted an identical methodology in its original investigation. ECF 58, at 5–6, 9–10. The court declines to entertain this new argument.

the opportunity to obtain a price adjustment for certification expenses, while avoiding the distortions reflected in the company's recalculation. *See* Appx1324 (explaining that Sahamitr's recomputation "continues to fail to account for months in which certification expenses are overreported (*e.g.*, the revised method continues to allocate multiple months of expenses to a single month)").

That brings us to the elephant in the courtroom that neither Sahamitr's nor Worldwide's opening brief directly confronts—Commerce's finding that the former's recalculated reporting *was* distorted because it resulted in months with zeroed-out certification expenses. Appx1025. That unchallenged determination is supported by substantial evidence. As the record shows, there were significant fluctuations in Sahamitr's recalculated expenses from month to month, including some months with zero expenses. *See* Appx5607. The Department therefore reasonably applied a methodology that allowed Sahamitr's export price to be properly adjusted, but which did not feature those distortions. Appx1323–1324.

The closest Sahamitr's opening brief comes to challenging the finding that the company's monthly-based calculation was distortive is the plaintive assertion that it's "unclear why [Sahamitr's] certification expenses—reported per the Department's instructions— were so unreasonably inaccurate that an alternate allocation methodology was warranted." ECF 29-1, at 11. Commerce, however, explained precisely *why* it found that calculation distortive: The "timing differences between when [Sahamitr] produces and sells

cylinders and when it records the certification expenses associated with those sales . . . create monthly fluctuations in [the company's] reported certification[] expenses (*e.g.*, two months of expenses allocated to a single month and no fee expenses allocated to other months)." Appx1025. Sahamitr fails to articulate how or why that determination is unreasonable or otherwise not supported by substantial evidence.

The company's more thorough reply brief argues that the finding that its monthly-based calculations were distortive, Appx1025, is unreasonable because fluctuations are inherent in such computations. ECF 58, at 6–7. Similarly, it maintains that the Department unreasonably rejected "an alternative allocation that [Sahamitr] proposed in its case brief to address the purported concerns about 'timing differences.'" *Id.* at 8. The company further contends that "the antidumping questionnaire itself **presumes** differences based on timing when it directs respondents to 'demonstrate that the allocation is calculated on as specific a basis as is feasible (e.g., on a customer-specific basis, product-specific basis, **and/or monthly-specific basis**, etc.).'" *Id.* at 8–9 (boldface Sahamitr's) (quoting Appx6027).

The court rejects these new arguments, not only because they're untimely, but also because they're wrong on the merits. The regulation expressly authorizes Commerce to disregard a respondent's *allocated* expense reporting, even if it is as specific as possible, if the Department concludes that it "cause[s] inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1). Contrary to Sahamitr's specificity–über alles reading, specificity

**Ct. No. 22-00107**                                                      **Page 11**

in allocated reporting under the regulation is merely a
means to an end, not an end in itself.

\*    \*    \*

The court denies the motions for judgment on the
agency record and sustains Commerce's final determi-
nation. A separate judgment will issue. *See* USCIT
R. 58(a).

Dated:  May 2, 2024                 /s/ *M. Miller Baker*
          New York, NY         M. Miller Baker, Judge

*Steel Propane Cylinders From Thailand: FInal Results of Antidumping Duty Administrative Review; 2018-2020*

87 Fed. Reg. 12659
(March 7, 2022)

Appx12 - Appx13


# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–549–839]**

## Steel Propane Cylinders From Thailand: Final Results of Antidumping Duty Administrative Review; 2018–2020

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that Sahamitr Pressure Container Plc. (also known as Sahamitr Pressure Container Public Company Limited) made sales of subject merchandise at less than normal value during the period of review (POR), December 27, 2018, through July 31, 2020.

**DATES:** Applicable March 7, 2022.

**FOR FURTHER INFORMATION CONTACT:** Jolanta Lawska, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–8362.

**SUPPLEMENTARY INFORMATION:**

### Background

On September 2, 2021, Commerce published the *Preliminary Results*[1] and invited interested parties to comment on the *Preliminary Results.* On December 14, 2021, Commerce extended the deadline for the final results to March 1, 2022.[2] For a summary of events that occurred since the *Preliminary Results, see* the Issues and Decision Memorandum.[3] Commerce conducted this review in accordance with section 751 of the Tariff Act of 1930, as amended (the Act).

### Scope of the Order[4]

The merchandise covered by the *Order* is steel propane cylinders from Thailand. For a complete description of

---

[1] *See Steel Propane Cylinders from Thailand: Preliminary Results of Antidumping Duty Administrative Review; 2018–2020,* 86 FR 49295 (September 2, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Steel Propane Cylinders from Thailand: Extension of Time Limit for Final Results of Antidumping Duty administrative Review; 2018/2020," dated December 14, 2021.

[3] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Steel Propane Cylinders from Thailand; 2018–2020," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[4] *See Steel Propane Cylinders from the People's Republic of China and Thailand: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Orders,* 84 FR 41703 (August 15, 2019) (*Order*).

the scope of the *Order, see* the Issues and Decision Memorandum.[5]

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs are addressed in the Issues and Decision Memorandum. A list of the issues that parties raised and to which we responded in the Issues and Decision Memorandum is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx.*

### Final Results of the Review

Commerce determines that the following weighted-average dumping margin exists for the period December 27, 2018, through July 31, 2020:

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Sahamitr Pressure Container Plc ..................................... | 13.89 |

### Disclosure

We intend to disclose the calculations performed to parties in this proceeding within five days after publication of these final results in the **Federal Register**, in accordance with section 751(a) of the Act and 19 CFR 351.224(b).

### Assessment Rates

Pursuant to section 751(a)(2)(C) of the Act and 19 CFR 351.212(b)(1), Commerce will determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise in accordance with the final results of this review. We will calculate importer-specific assessment rates on the basis of the ratio of the total amount of dumping calculated for each importer's examined sales to the total entered value of the importer's sales in accordance with 19 CFR 351.212(b)(1).

Where the respondent's weighted-average dumping margin is either zero or *de minimis* within the meaning of 19 CFR 351.106(c)(1), or an importer-specific assessment rate is zero or *de*

---

[5] *See* Issues and Decision Memorandum at "Scope of the Order."

*minimis,* we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

Commerce's "automatic assessment" practice will apply to entries of subject merchandise during the POR produced by companies included in these final results of review for which the reviewed companies did not know that the merchandise they sold to the intermediary (*e.g.,* a reseller, trading company, or exporter) was destined for the United States. In such instances, we will instruct CBP to liquidate unreviewed entries at the all-others rate if there is no rate for the intermediate company(ies) involved in the transaction.[6]

Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

### Cash Deposit Requirements

The following cash deposit requirements for estimated antidumping duties will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for Sahamitr Pressure Container Plc. will be equal to its weighted-average dumping margin established in the final results of this administrative review (except if that rate is *de minimis,* in which situation the cash deposit rate will be zero); (2) for merchandise exported by a producer or exporter not covered in this review but covered in a prior completed segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recent period; (3) if the exporter is not a firm covered in this review, a prior review, or the original investigation but the producer has been covered in a prior complete segment of this proceeding, the cash deposit rate will be the company-specific rate established for the most recent period for the producer of the merchandise; (4) the cash deposit rate for all other producers or exporters

---

[6] *See Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

will continue to be 10.77 percent,[7] the all-others rate established in the less-than-fair-value investigation. These cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers Regarding the Reimbursement of Duties**

This notice also serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

**Notification Regarding Administrative Protective Order**

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

**Notification to Interested Parties**

We are issuing and publishing these final results of administrative review in accordance with sections 751(a)(1) and 777(i) of the Act, and 19 CFR 351.221(b)(5).

Dated: March 1, 2022.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix—List of Topics Discussed in the Final Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Changes Since the Preliminary Results
V. Discussion of the Issues
  Comment 1: Whether Commerce Should "Cap" Sahamitr Pressure Container Public Company Limited's (SMPC) Reported Freight Revenue at the Amount of Actual Freight Expenses SMPC Incurred
  Comment 2: Whether Commerce Made a Ministerial Error Regarding Treatment of SMPC's Bank Charges

[7] See *Order,* 84 FR at 41704.

Comment 3: Whether Commerce Should Use SMPC's Month-Specific Certification Expenses in the Final Results
Comment 4: Whether Commerce Should Reverse the Adjustment Made to SMPC's Reported Scrap Offset in the Final Results
VI. Recommendation
[FR Doc. 2022–04756 Filed 3–4–22; 8:45 am]
**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–580–883]**

**Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2019–2020**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that the producers/exporters subject to this review made sales of subject merchandise at less than normal value during the period of review (POR), October 1, 2019, through September 30, 2020.

**DATES:** Applicable March 7, 2022.

**FOR FURTHER INFORMATION CONTACT:** Christopher Williams or Thomas Schauer, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–5166 or (202) 482–0410, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On October 29, 2021, Commerce published the preliminary results of the 2019–2020 administrative review of the antidumping duty order on hot-rolled steel flat products (hot-rolled steel) from the Republic of Korea (Korea).[1] This review covers two producer/exporters of the subject merchandise, Hyundai Steel Company (Hyundai Steel) and POSCO.[2]

---

[1] See *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2019– 2020,* 86 FR 59985 (October 29, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

[2] We initiated this review with respect to POSCO and POSCO Daewoo Corporation. We preliminarily found that POSCO International Corporation (PIC) is the successor-in-interest to POSCO Daewoo Corporation (PDW) and treated POSCO and PIC as a single entity. See Preliminary Decision Memorandum. For the final results, we continue treat POSCO and PIC as a single entity, hereinafter collectively referred to as POSCO. See "Successor-in-Interest Determination" and "Affiliation and Single Entity Treatment" sections of this notice.

We invited parties to comment on the *Preliminary Results.*[3] On November 29, 2021, we received case briefs from the petitioners[4] and from the mandatory respondents, Hyundai Steel and POSCO.[5] On December 6, 2021, the petitioners, Hyundai Steel, and POSCO submitted rebuttal briefs.[6] Commerce conducted this review in accordance with section 751(a)(1)(B) of the Tariff Act of 1930, as amended (the Act).

**Scope of the Order**

The products covered by the *Order*[7] are hot-rolled steel. A full description of the scope of the *Order* is contained in the Issues and Decision Memorandum.[8]

**Analysis of Comments Received**

All issues raised in the case and rebuttal briefs that were submitted by parties in this administrative review are addressed in the Issues and Decision Memorandum and are listed in the appendix to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https:// access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed at *https://access.trade.gov/public/ FRNoticesListLayout.aspx.*

---

[3] See *Preliminary Results,* 86 FR at 59985.

[4] See Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Petitioners' Case Brief," dated November 29, 2021. The petitioners are SSAB Enterprises, LLC, and Steel Dynamics, Inc. (collectively, the petitioners).

[5] See Hyundai Steel's Letter, "Certain Hot-Rolled Steel Flat Products from Korea, 10/01/2019–9/30/ 2020 Administrative Review, Case No. A–580–883: Hyundai Steel's Case Brief" dated November 29, 2021; and POSCO's Letter, "Hot-Rolled Steel Flat Products from the Republic of Korea—POSCO's Case Brief," dated November 29, 2021.

[6] See Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Petitioners' Rebuttal Brief," dated December 6, 2021; see also Hyundai Steel's Letter, "Certain Hot-Rolled Steel Flat Products from Korea, 10/01/2019– 9/30/2020 Administrative Review, Case No. A–580– 883: Hyundai Steel's Case Brief"; and POSCO's Letter, "Hot-Rolled Steel Flat Products from the Republic of Korea—POSCO's Rebuttal Brief," both dated December 6, 2021.

[7] See *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders,* 81 FR 67962 (October 3, 2016) (*Order*).

[8] See Memorandum, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2019– 2020," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

19 U.S.C. § 1677b



EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

## § 1677b. Normal value

### (a) Determination

In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value. In order to achieve a fair comparison with the export price or constructed export price, normal value shall be determined as follows:

### (1) Determination of normal value

#### (A) In general

The normal value of the subject merchandise shall be the price described in subparagraph (B), at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price under section 1677a(a) or (b) of this title.

#### (B) Price

The price referred to in subparagraph (A) is—

(i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price, or

(ii) in a case to which subparagraph (C) applies, the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States, if—

(I) such price is representative,

(II) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States, and

(III) the administering authority does not determine that the particular market situation prevents a proper comparison with the export price or constructed export price.

#### (C) Third country sales

This subparagraph applies when—

(i) the foreign like product is not sold (or offered for sale) for consumption in the exporting country as described in subparagraph (B)(i),

(ii) the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States, or

(iii) the particular market situation in the exporting country does not permit a proper comparison with the export price or constructed export price.

For purposes of clause (ii), the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.

### (2) Fictitious markets

No pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account in determining normal value. The occurrence of different movements in the prices at which different forms of the foreign like product are sold (or, in the absence of sales, offered for sale) in the exporting country after the issuance of an antidumping duty order may be considered by the administering authority as evidence of the establishment of a fictitious market for the foreign like product if the movement in such prices appears to reduce the amount by which the normal value exceeds the export price (or the constructed export price) of the subject merchandise.

### (3) Exportation from an intermediate country

Where the subject merchandise is exported to the United States from an intermediate country, normal value shall be determined in the intermediate country, except that normal value may be determined in the country of origin of the subject merchandise if—

(A) the producer knew at the time of the sale that the subject merchandise was destined for exportation;

(B) the subject merchandise is merely transshipped through the intermediate country;

(C) sales of the foreign like product in the intermediate country do not satisfy the conditions of paragraph (1)(C); or

(D) the foreign like product is not produced in the intermediate country.

### (4) Use of constructed value

If the administering authority determines that the normal value of the subject merchandise cannot be determined under paragraph (1)(B)(i), then, notwithstanding paragraph (1)(B)(ii), the normal value of the subject merchandise may be the constructed value of that merchandise, as determined under subsection (e).

### (5) Indirect sales or offers for sale

If the foreign like product is sold or, in the absence of sales, offered for sale through an affiliated party, the prices at which the foreign like product is sold (or offered for sale) by such affiliated party may be used in determining normal value.

### (6) Adjustments

The price described in paragraph (1)(B) shall be—

(A) increased by the cost of all containers and coverings and all other costs, charges,

and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States;

(B) reduced by—

(i) when included in the price described in paragraph (1)(B), the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the foreign like product in condition packed ready for shipment to the place of delivery to the purchaser,

(ii) the amount, if any, included in the price described in paragraph (1)(B), attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser, and

(iii) the amount of any taxes imposed directly upon the foreign like product or components thereof which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product, and

(C) increased or decreased by the amount of any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise provided under this section) that is established to the satisfaction of the administering authority to be wholly or partly due to—

(i) the fact that the quantities in which the subject merchandise is sold or agreed to be sold to the United States are greater than or less than the quantities in which the foreign like product is sold, agreed to be sold, or offered for sale,

(ii) the fact that merchandise described in subparagraph (B) or (C) of section 1677(16) of this title is used in determining normal value, or

(iii) other differences in the circumstances of sale.

**(7) Additional adjustments**

**(A) Level of trade**

The price described in paragraph (1)(B) shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade—

(i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

**(B) Constructed export price offset**

When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 1677a(d)(1)(D) of this title.

**(8) Adjustments to constructed value**

Constructed value as determined under subsection (e), may be adjusted, as appropriate, pursuant to this subsection.

**(b) Sales at less than cost of production**

**(1) Determination; sales disregarded**

Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production. If the administering authority determines that sales made at less than the cost of production—

(A) have been made within an extended period of time in substantial quantities, and

(B) were not at prices which permit recovery of all costs within a reasonable period of time,

such sales may be disregarded in the determination of normal value. Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade. If no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise.

**(2) Definitions and special rules**

For purposes of this subsection—

**(A) Reasonable grounds to believe or suspect**

**(i) Review**

In a review conducted under section 1675 of this title involving a specific exporter, there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that are less than the cost of production of the product if the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or, if a review has been completed, in the most recently completed review.

**(ii) Requests for information**

In an investigation initiated under section 1673a of this title or a review con-

ducted under section 1675 of this title, the administering authority shall request information necessary to calculate the constructed value and cost of production under subsections (e) and (f) to determine whether there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that represent less than the cost of production of the product.

**(B) Extended period of time**

The term ''extended period of time'' means a period that is normally 1 year, but not less than 6 months.

**(C) Substantial quantities**

Sales made at prices below the cost of production have been made in substantial quantities if—

    (i) the volume of such sales represents 20 percent or more of the volume of sales under consideration for the determination of normal value, or

    (ii) the weighted average per unit price of the sales under consideration for the determination of normal value is less than the weighted average per unit cost of production for such sales.

**(D) Recovery of costs**

If prices which are below the per unit cost of production at the time of sale are above the weighted average per unit cost of production for the period of investigation or review, such prices shall be considered to provide for recovery of costs within a reasonable period of time.

**(3) Calculation of cost of production**

For purposes of this part, the cost of production shall be an amount equal to the sum of—

    (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

    (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

    (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

For purposes of subparagraph (A), if the normal value is based on the price of the foreign like product sold for consumption in a country other than the exporting country, the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted or refunded upon exportation.

**(c) Nonmarket economy countries**

**(1) In general**

If—

    (A) the subject merchandise is exported from a nonmarket economy country, and

    (B) the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a),

the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

**(2) Exception**

If the administering authority finds that the available information is inadequate for purposes of determining the normal value of subject merchandise under paragraph (1), the administering authority shall determine the normal value on the basis of the price at which merchandise that is—

    (A) comparable to the subject merchandise, and

    (B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,

is sold in other countries, including the United States.

**(3) Factors of production**

For purposes of paragraph (1), the factors of production utilized in producing merchandise include, but are not limited to—

    (A) hours of labor required,

    (B) quantities of raw materials employed,

    (C) amounts of energy and other utilities consumed, and

    (D) representative capital cost, including depreciation.

**(4) Valuation of factors of production**

The administering authority, in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—

    (A) at a level of economic development comparable to that of the nonmarket economy country, and

    (B) significant producers of comparable merchandise.

**(5) Discretion to disregard certain price or cost values**

In valuing the factors of production under paragraph (1) for the subject merchandise, the administering authority may disregard price or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order.

### (d) Special rule for certain multinational corporations

Whenever, in the course of an investigation under this subtitle, the administering authority determines that—

(1) subject merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls, directly or indirectly, other facilities for the production of the foreign like product which are located in another country or countries,

(2) subsection (a)(1)(C) applies, and

(3) the normal value of the foreign like product produced in one or more of the facilities outside the exporting country is higher than the normal value of the foreign like product produced in the facilities located in the exporting country,

it shall determine the normal value of the subject merchandise by reference to the normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country. The administering authority, in making any determination under this paragraph, shall make adjustments for the difference between the cost of production (including taxes, labor, materials, and overhead) of the foreign like product produced in facilities outside the exporting country and costs of production of the foreign like product produced in facilities in the exporting country, if such differences are demonstrated to its satisfaction. For purposes of this subsection, in determining the normal value of the foreign like product produced in a country outside of the exporting country, the administering authority shall determine its price at the time of exportation from the exporting country and shall make any adjustments required by subsection (a) for the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States by reference to such costs in the exporting country.

### (e) Constructed value

For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—

(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade;

(2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(B) if actual data are not available with respect to the amounts described in subparagraph (A), then—

(i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States.

For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials.

### (f) Special rules for calculation of cost of production and for calculation of constructed value

For purposes of subsections (b) and (e).—[1]

#### (1) Costs

##### (A) In general

Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the ex-

---

[1] So in original. The period preceding the dash probably should not appear.

porter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

**(B) Nonrecurring costs**

Costs shall be adjusted appropriately for those nonrecurring costs that benefit current or future production, or both.

**(C) Startup costs**

**(i) In general**

Costs shall be adjusted appropriately for circumstances in which costs incurred during the time period covered by the investigation or review are affected by startup operations.

**(ii) Startup operations**

Adjustments shall be made for startup operations only where—

(I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

(II) production levels are limited by technical factors associated with the initial phase of commercial production.

For purposes of subclause (II), the initial phase of commercial production ends at the end of the startup period. In determining whether commercial production levels have been achieved, the administering authority shall consider factors unrelated to startup operations that might affect the volume of production processed, such as demand, seasonality, or business cycles.

**(iii) Adjustment for startup operations**

The adjustment for startup operations shall be made by substituting the unit production costs incurred with respect to the merchandise at the end of the startup period for the unit production costs incurred during the startup period. If the startup period extends beyond the period of the investigation or review under this subtitle, the administering authority shall use the most recent cost of production data that it reasonably can obtain, analyze, and verify without delaying the timely completion of the investigation or review. For purposes of this subparagraph, the startup period ends at the point at which the level of commercial production that is characteristic of the merchandise, producer, or industry concerned is achieved.

**(2) Transactions disregarded**

A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would

have been if the transaction had occurred between persons who are not affiliated.

**(3) Major input rule**

If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

(June 17, 1930, ch. 497, title VII, §773, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 182; amended Pub. L. 98–573, title VI, §§615, 620(b), Oct. 30, 1984, 98 Stat. 3036, 3039; Pub. L. 99–514, title XVIII, §1886(a)(11), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §§1316(a), 1318, 1319, Aug. 23, 1988, 102 Stat. 1186, 1189; Pub. L. 103–465, title II, §224, Dec. 8, 1994, 108 Stat. 4878; Pub. L. 114–27, title V, §§504(b), (c), 505, June 29, 2015, 129 Stat. 385.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (a)(1)(B)(ii)(III). Pub. L. 114–27, §504(b), which directed amendment of subcl. (III) by striking out "in such other country:", was executed by striking out "in such other country" after "particular market situation" to reflect the probable intent of Congress.

Subsec. (b)(2)(A). Pub. L. 114–27, §505(a), added subpar. (A) and struck out former subpar. (A). Prior to amendment, text read as follows: "There are reasonable grounds to believe or suspect that sales of the foreign like product were made at prices that are less than the cost of production of the product, if—

"(i) in an investigation initiated under section 1673a of this title or a review conducted under section 1675 of this title, an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title provides information, based upon observed prices or constructed prices or costs, that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of the product; or

"(ii) in a review conducted under section 1675 of this title involving a specific exporter, the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or if a review has been completed, in the most recently completed review."

Subsec. (c)(5). Pub. L. 114–27, §505(b), added par. (5).

Subsec. (e). Pub. L. 114–27, §504(c)(2), in concluding provisions, substituted "For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials." for "For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted

or refunded upon exportation of the subject merchandise produced from such materials.''

Subsec. (e)(1). Pub. L. 114–27, § 504(c)(1), substituted ''trade'' for ''business''.

1994—Pub. L. 103–465 amended section generally, substituting present provisions for provisions relating to foreign market value, which provided for determination of value in subsec. (a), sales at less than cost of production in subsec. (b), treatment of merchandise from nonmarket economy countries in subsec. (c), special rule for certain multinational corporations in subsec. (d), determination of constructed value in subsec. (e), and exportation from an intermediate country in subsec. (f).

1988—Subsec. (a)(5). Pub. L. 100–418, § 1319, added par. (5).

Subsec. (c). Pub. L. 100–418, § 1316(a), amended subsec. (c) generally, substituting provisions relating to nonmarket economy countries, for provisions relating to State-controlled economies.

Subsec. (e)(2) to (4). Pub. L. 100–418, § 1318, substituted ''(4)'' for ''(3)'' wherever appearing in par. (2), added par. (3), and redesignated former par. (3) as (4) and in introductory provisions substituted ''paragraphs (2) and (3)'' for ''paragraph (2)''.

1986—Subsecs. (f), (g). Pub. L. 99–514 redesignated subsec. (g) as (f).

1984—Subsec. (a)(1). Pub. L. 98–573, § 615(1), substituted ''time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person'' for ''time of exportation of such merchandise to the United States'' in provisions before subpar. (A).

Subsecs. (a)(1)(A), (4)(A), (e)(1)(B). Pub. L. 98–573, § 615(2), substituted ''commercial quantities'' for ''wholesale quantities'' wherever appearing.

Subsec. (f). Pub. L. 98–573, § 620(b), struck out subsec. (f) which related to the authority to use sampling techniques and to disregard insignificant adjustments.

Subsec. (g). Pub. L. 98–573, § 615(3), added subsec. (g).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by sections 1316(a) and 1318 of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, and amendment by section 1319 of Pub. L. 100–418 applicable with respect to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, and to reviews initiated under such sections which are pending on Aug. 23, 1988, and in which a request for revocation is pending on Aug. 23, 1988, see section 1337(b), (f) of Pub. L. 100–418, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 615 of Pub. L. 98–573 effective Oct. 30, 1984, and amendment by section 620(b) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1677b–1. Currency conversion

### (a) In general

In an antidumping proceeding under this subtitle, the administering authority shall convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise, except that, if it is established that a currency transaction on forward markets is directly linked to an export sale under consideration, the exchange rate specified with respect to such currency in the forward sale agreement shall be used to convert the foreign currency. Fluctuations in exchange rates shall be ignored.

### (b) Sustained movement in foreign currency value

In an investigation under part II of this subtitle, if there is a sustained movement in the value of the foreign currency relative to the United States dollar, the administering authority shall allow exporters at least 60 days to adjust their export prices to reflect such sustained movement.

(June 17, 1930, ch. 497, title VII, § 773A, as added Pub. L. 103–465, title II, § 225(a), Dec. 8, 1994, 108 Stat. 4886.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

## § 1677c. Hearings

### (a) Investigation hearings

#### (1) In general

Except as provided in paragraph (2), the administering authority and the Commission shall each hold a hearing in the course of an investigation upon the request of any party to the investigation before making a final determination under section 1671d or 1673d of this title.

#### (2) Exception

If investigations are initiated under part I and part II of this subtitle regarding the same merchandise from the same country within 6 months of each other (but before a final determination is made in either investigation), the holding of a hearing by the Commission in the course of one of the investigations shall be

19 C.F.R. § 341.401



consumer organization, as described in section 777(h) of the Act, may submit relevant factual information and written argument to the Department under paragraphs (d)(3)(ii), and (d)(3)(vi), and (d)(4) of §351.218, paragraphs (b), (c)(1), and (c)(3) of §351.301, and paragraphs (c), (d), and (e) of §351.309 concerning dumping or a countervailing subsidy. All such submissions must be filed in accordance with §351.303.

(c) *Business proprietary information.* Persons described in paragraph (b) of this section may request business proprietary treatment of information under §351.304, but will not be granted access under §351.305 to business proprietary information submitted by other persons.

[62 FR 27379, May 19, 1997, as amended at 63 FR 13524, Mar. 20, 1998]

**§351.313   Attorneys or representatives.**

*In general.* No register of attorneys or representatives who may practice before the Department is maintained. No application for admission to practice is required. Any person desiring to appear as attorney or representative before the Department may be required to show to the satisfaction of the Secretary his acceptability in that capacity. Any attorney or representative practicing before the Department, or desiring so to practice, may for good cause shown be suspended or barred from practicing before the Department, or have imposed on him such lesser sanctions (e.g., public or private reprimand) as the Secretary deems appropriate, but only after he has been accorded an opportunity to present his views in the matter. The Department will maintain a public register of attorneys and representatives suspended or barred from practice. ''Attorney'' pursuant to this subpart and ''legal counsel'' in §351.303(g) have the same meaning. ''Representative'' pursuant to this subpart and in §351.303(g) has the same meaning.

[78 FR 22777, Apr. 17, 2013]

## Subpart D—Calculation of Export Price, Constructed Export Price, Fair Value, and Normal Value

**§351.401   In general.**

(a) *Introduction.* In general terms, an antidumping analysis involves a comparison of export price or constructed export price in the United States with normal value in the foreign market. This section establishes certain general rules that apply to the calculation of export price, constructed export price and normal value. (*See* section 772, section 773, and section 773A of the Act.)

(b) *Adjustments in general.* In making adjustments to export price, constructed export price, or normal value, the Secretary will adhere to the following principles:

(1) The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment; and

(2) The Secretary will not double-count adjustments.

(c) *Use of price net of price adjustments.* In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in §351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.

(d) *Delayed payment or pre-payment of expenses.* Where cost is the basis for determining the amount of an adjustment to export price, constructed export price, or normal value, the Secretary will not factor in any delayed payment or pre-payment of expenses by the exporter or producer.

(e) *Adjustments for movement expenses*—(1) *Original place of shipment.* In making adjustments for movement expenses to establish export price or constructed export price under section 772(c)(2)(A) of the Act, or normal value under section 773(a)(6)(B)(ii) of the Act,

319

the Secretary normally will consider the production facility as being the "original place of shipment." However, where the Secretary bases export price, constructed export price, or normal value on a sale by an unaffiliated reseller, the Secretary may treat the original place from which the reseller shipped the merchandise as the "original place of shipment."

(2) *Warehousing.* The Secretary will consider warehousing expenses that are incurred after the subject merchandise or foreign like product leaves the original place of shipment as movement expenses.

(f) *Treatment of affiliated producers in antidumping proceedings*—(1) *In general.* In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

(2) *Significant potential for manipulation.* In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:

(i) The level of common ownership;

(ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

(iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

(g) *Allocation of expenses and price adjustments*—(1) *In general.* The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions.

(2) *Reporting allocated expenses and price adjustments.* Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.

(3) *Feasibility.* In determining the feasibility of transaction-specific reporting or whether an allocation is calculated on as specific a basis as is feasible, the Secretary will take into account the records maintained by the party in question in the ordinary course of its business, as well as such factors as the normal accounting practices in the country and industry in question and the number of sales made by the party during the period of investigation or review.

(4) *Expenses and price adjustments relating to merchandise not subject to the proceeding.* The Secretary will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable).

(h) [Reserved]

(i) *Date of sale.* In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

[62 FR 27379, May 19, 1997, as amended at 73 FR 16518, Mar. 28, 2008; 81 FR 15645, Mar. 24, 2016]

**§ 351.402 Calculation of export price and constructed export price; reimbursement of antidumping and countervailing duties.**

(a) *Introduction.* In order to establish export price, constructed export price, and normal value, the Secretary must make certain adjustments to the price to the unaffiliated purchaser (often called the "starting price") in both the United States and foreign markets.

19 C.F.R. § 351.410



is satisfied that the amount of any price differential (or lack thereof) is wholly or partly due to that difference in quantities. (*See* section 773(a)(6)(C)(i) of the Act.)

(b) *Sales with quantity discounts in calculating normal value.* The Secretary normally will calculate normal value based on sales with quantity discounts only if:

(1) During the period examined, or during a more representative period, the exporter or producer granted quantity discounts of at least the same magnitude on 20 percent or more of sales of the foreign like product for the relevant country; or

(2) The exporter or producer demonstrates to the Secretary's satisfaction that the discounts reflect savings specifically attributable to the production of the different quantities.

(c) *Sales with quantity discounts in calculating weighted-average normal value.* If the exporter or producer does not satisfy the conditions of paragraph (b) of this section, the Secretary will calculate normal value based on weighted-average prices that include sales at a discount.

(d) *Price lists.* In determining whether a discount has been granted, the existence or lack of a published price list reflecting such a discount will not be controlling. Ordinarily, the Secretary will give weight to a price list only if, in the line of trade and market under consideration, the exporter or producer demonstrates that it has adhered to its price list.

(e) *Relationship to level of trade adjustment.* If adjustments are claimed for both differences in quantities and differences in level of trade, the Secretary will not make an adjustment for differences in quantities unless the Secretary is satisfied that the effect on price comparability of differences in quantities has been identified and established separately from the effect on price comparability of differences in the levels of trade.

## §351.410 Differences in circumstances of sale.

(a) *Introduction.* In calculating normal value the Secretary may make adjustments to account for certain differences in the circumstances of sales

in the United States and foreign markets. (*See* section 773(a)(6)(C)(iii) of the Act.) This section clarifies certain terms used in the statute regarding circumstances of sale adjustments and describes the adjustment when commissions are paid only in one market.

(b) *In general.* With the exception of the allowance described in paragraph (e) of this section concerning commissions paid in only one market, the Secretary will make circumstances of sale adjustments under section 773(a)(6)(C)(iii) of the Act only for direct selling expenses and assumed expenses.

(c) *Direct selling expenses.* ''Direct selling expenses'' are expenses, such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question.

(d) *Assumed expenses.* Assumed expenses are selling expenses that are assumed by the seller on behalf of the buyer, such as advertising expenses.

(e) *Commissions paid in one market.* The Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under considerations, and no commission is paid in the other market under consideration. The Secretary will limit the amount of such allowance to the amount of the other selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

(f) *Reasonable allowance.* In deciding what is a reasonable allowance for any difference in circumstances of sale, the Secretary normally will consider the cost of such difference to the exporter or producer but, if appropriate, may also consider the effect of such difference on the market value of the merchandise.

## §351.411 Differences in physical characteristics.

(a) *Introduction.* In comparing United States sales with foreign market sales, the Secretary may determine that the merchandise sold in the United States does not have the same physical characteristics as the merchandise sold in

327

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2024-2043

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 3,183 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: November 25, 2024

Signature:   /s/ Jay C. Campbell_____

Name:          Jay C. Campbell___

**CERTIFICATE OF SERVICE**

**CAFC Court No. 2024-2043**

I hereby certify that on November 25, 2024 the foregoing document filed on behalf of Sahamitr Pressure Container PLC. was served upon all parties by operation of the Court's electronic filing system.

Date: November 25, 2024        /s/ Jay C. Campbell
                                           Jay C. Campbell
                                           WHITE & CASE LLP
                                           701 Thirteenth Street, NW
                                           Washington, DC 20005
                                           (202) 626-3600